Mr. Rudman, when you're ready. Your Honor, give me just a moment, please. Sure, take your time. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. My name is David Rudman. I represent the Leggett & Platt appellants today. With me are Gordon Bilheimer, Chief Litigation Counsel on behalf of Leggett & Platt, and James Serber, my co-counsel. I thought I'd start this morning by just quickly introducing the technology and how the 518 patent dramatically changed the industry. The technology is related to large format printers, which you can think of as an overgrown inkjet printer, probably very similar to what you have in your home, that have a carriage that has inkjet heads on it that travel back and forth across a substrate, which is paper, likely in your home, that sprays ink down on the paper as the paper and the substrate goes through the printer. This is an example of one large format print that was actually printed using one of the accused Vutek printers, using an image by David Spencer, one of the experts that Leggett & Platt retained that he uses for purposes of assessing print quality. The prints that go through these printers can be up to eight foot wide and indefinite in length. One of the very important features of these printers, which is material to understanding the term deform in this case, is the print gap. The print gap is the distance between the substrate and the print heads. Despite the huge size of these printers, the print gap is actually one to two millimeters. To put that in context, that's about the thickness of a dime. Prior to the invention, predominantly the printing industry used solvent inks. Solvent inks are inks that you spray on the substrates, they either dry over time, or sometime later after you spray them down on the substrates, you use a heater or something to dry them later. Mr. Kodos, the inventor of the 518 patent, had a need to quickly cure the ink on the substrates because initially he was using textiles, fabrics. When you sprayed the ink on the fabrics, it spread, it soaked into the material. Indeed, solvent printers had the same problem. When you spray the ink on the substrates, it has a tendency to spread because you're waiting a period of time to cure the ink. Or if it's a very slick surface, the drops of ink can actually ball up as well, or wick into material if it's a porous type of material. Can I just move on before the clock is running? Absolutely. Just to get to the heart of it. On the anticipation analysis, it strikes me that there are at least two points that arguably seem compelling in terms of concluding there is anticipation of the 823 patent. And those two are the 7B figure in the 823 and the D3 and whether that satisfies a substantial cure. And the other being column 6 in the 823 which talks about curing and curing with a curing station, referring to this other figure 12. So could you kind of address yourself to those two points and explain to me why those references, that disclosure was not sufficient to satisfy? Absolutely, Judge. I appreciate the questions. The 823 patent is directed to set forth in its title and cover to cover, it's only directed to setting ink under the printing station. Setting is not substantially curing ink as the 823 patent defines. It's using just enough energy to begin to cure the ink so that you have a drop of ink that's still in a quasi-fluid state. Essentially, if you run your hand over that print, it will smear. If you put it in packaging, it will smear. It's not substantially cured. Figure 7B has only one purpose in the patent, in the 823 patent. And that sole purpose is to teach you what you cannot do with the invention that's claimed in the 823 patent. The language it uses specifically is that the purpose of 7B is to illustrate that if you go with 40 millijoules per centimeter squared, if you go with one pass, it won't cure the ink. If you go with two passes, it won't cure the ink. If you go with 30 passes, which nobody in their right mind would ever do, it will not cure the ink. The point is... But wasn't their test, I mean, it was not controverted, was it, that the STC represented 75 to 80% cure? It was controverted. It was controverted. It was controverted, absolutely. There was one reference in the record where, during a line of questioning of a patent expert, Mr. Dal Shefty, where they asked him, how far does that line go? And he said, well, you know, it doesn't matter how far that line goes. He was estimating the length of the line as opposed to stating that the... In other words, he was taking the diagram, I take it, as if it were a quantitatively accurate... He wasn't. He wasn't, Your Honor, but he was being asked to do that by the people proposing him during the deposition. Okay. He's a patent lawyer. He knows that figures, according to the circuit's predominant case law, that figures in a patent, just like MPEP section 2125 says, that they can't be quantitative. They are not quantitative unless the specification specifically sets out what is the length of that line. There is no length given for that line. The only thing that's given is at the end of that passage, Your Honor, at A4507, this is in column 6, lines 2 to 3, after it describes that even with 30 passes, which nobody would do, it's sufficient to set the ink but not to cure it. That's all figure 7B is for, is to tell you that this invention is for setting. It's not for substantially curing ink. Does that adequately address your questions on that? No, I think you've addressed the point. Backing up a little bit, is there any disadvantage to curing at the outset if you can? In other words, if you have a sufficient LED that gives a non-heat, cold UV that you can cure instantaneously, there's no disadvantage to that. There's no advantage to setting and then curing later, correct? What the 823 patent teaches is it's interested in speed. It wants to get these through as quickly as possible because these manufacturers are interested in getting these through as quickly as possible. So by using low energy, using setting, using UV energy that it's the right level, that's LEDs, which there's also evidence in the record from Mr. Spencer, an expert in the field, a gentleman who did these printers, this image over here, that the LEDs weren't capable at that point in time. That's the question. The only thing that's really in play here is that the LEDs that were used at the time, the 823, just weren't strong enough. That's one factor. But no, the other big factor which specifically addresses your question is the 823 teaches you to get these through quickly. You want low energy. You want to be able to let these things fly through, set the ink, and then cure it sometime later downstream. Why does the low energy actually help them if you have high energy at the outset but you can do it just as fast and you can get the print through just as fast and you've got it completely cured? Why isn't that just as good or better? Well, you know, that's what Mr. Kodos invented. That's something that Vutec and Mr. Cleary didn't recognize. They were going down a different path. The 823 patent teaches away from doing that. Their idea was let's set it. That's what had been done in the past. You spray ink on and then you cure it later. They went to that next step as we're going to spray the ink on, we're going to try to freeze it in position, and then we'll still cure it later. They hadn't gotten to the point. They didn't recognize deformation issues. They didn't recognize the advantages of cold UV. They didn't recognize that it would be helpful to substantially cure the ink onto the printing station. The 823 patent never gets anywhere near that, and Judge Perry recognized that. Well, that's part of my question, and that's why reading, and this goes to, I guess, figure 12, but reading column 6 sort of towards the end of that paragraph beginning at line 55, let's say, talks about figure 12, and it does. So tell me why I'm misreading this. It concludes by saying it's cured with the curing station. So that curing station that appears in figure 12. Yes. It emits radiation with an intensity higher than that of the radiation sources used to set. So that's cured, right? Not under the printing station. Figures 11 and 12 show two embodiments, and they're all consistent, that you set and then you later cure. And that's the same thing that column 6 says, is that you're setting, and that's, I think, items 42.1 and 42.2 are the LEDs, that you're setting that ink under the printing station, and then sometime later that you are then curing it with what is 300, the curing station. Again, there are no dimensions given for how far downstream that is. They're just showing that you can connect an apparatus, a second curing station if you want to, but it's a two-step process. It's set, and then there's some period of time before that substrate, which is 32, advances a little bit further, and then it's cured. And so comparing that to the, I guess, I'm still having a little trouble here, because comparing that to the patent, so the difference is between whether it's a one-step or a two-step process? Is that the distinguishing characteristic? That is the distinguishing, well, two distinguishing characteristics. One is item 300 isn't cold UV. It's an ordinary high-energy curing station of some sort that's going to dry the ink. That's a little ambiguous, right, at least ambiguous. It's certainly not teaching that it's cold UV. It's not teaching that it's LEDs, and LEDs were incapable at this time of curing ink anyway. It didn't recognize the advantages of substantially curing ink under the printing station. It was a two-step process. You use LEDs to set, which is 42.1 and 42.2, and then you have a second step. You have a second curing station. It's more expensive. It's another apparatus where you cure it at 300. That's exactly what Column 6 discusses and specifies, Your Honor. It uses a language, is subsequently cured with the curing station 300. It talks about that it's set by radiation sources 42.1-42.2 on lines 57 and 58, and then subsequently, later, it's cured using a separate curing station. It's showing just a different place where you can put the secondary curing station. Okay? Any more questions on that issue? I'd like to move on to the issue of deform, where the district court erred in finding that the term deform is indefinite. The district court originally got it correct, and then inexplicably on summary judgment got it wrong. The district court held that a level of subjectivity is required in order to determine what deform means in the context of the 518 patent. To understand deform, the only issue here is heat-induced deformation. That is, when you have a high-energy lamp that is not cold UV, what happens is it imparts enough energy on the substrate that the substrate can distort, disfigure, such that it rises up and can strike the printhead. Because remember, we have a 1-2 millimeter gap. So that's the issue, is heat-induced deformation. It doesn't have anything to do with the factors that the district court relied on in looking at whether print quality was subjective or not. Judge Perry, who's a very good judge, but she got a little confused here, she said, well, factors such as lighting and size and the amount of text, the amount of image and the color have some subjective components, therefore deform is indefinite. Heat-induced deformation has nothing to do with any of these factors. It only has to do with whether or not that substrate is going to rise up and hit the printhead, or whether or not you're going to have to move that printhead up higher such that you have insufficient quality. Well, is your position, and from your briefs I wasn't exactly sure about this, but is your position that deformation requires either that there be a hitting of the printhead or burning, in other words, some kind of accident that occurs inside the system, as opposed to deformation that is smaller than that, but large enough so that it has an effect on print quality that an expert could detect? The former, Judge. Because if you have, you always, when we turn these lights on, the piece of paper here is going to change. It's going to absorb some energy. There's always some measurable change. The issue is whether or not that print gap is exceeded such that you strike the printhead, or you don't always have to have a head strike. Operators out there in the field, mutex operators of their printers, what happens is the operator starts seeing temporary deformation where the heat is causing it to rise, and they'll raise that printhead up above that zone, and then you get a degradation in print quality such that it's unacceptable. If you raise it up to four or five millimeters, you end up with ink spraying all over and you end up with poor resolution. Can the resolution be affected in a discernible way by a deformation that does not rise high enough to risk striking the head, but nonetheless is above the level of the bed? Not that it wouldn't. One, would it be discernible? Probably not. If it were discernible, maybe with somebody coming along with a loop. Not people who are looking at these from the distance you are looking at this print from. You don't look at these from five or ten or 18 inches away. No. In fact, what's interesting about these substrates is they're not perfectly engineered. They're not flat. They vary by as much as a half a millimeter or more. It's made of paper. It's a sandwich of paper and foam. If you set that gap at one millimeter, actually that gap is going to change across the course of that substrate as people of ordinary skill in the art understand. It won't make unacceptable print quality. Where you end up with unacceptable print quality is if you increase that gap to more than two millimeters, as is recited in the 518 patent, such that now you've created a situation where you've got ink spraying all over the place and you have insufficient quality, or you have a head strike or burning. Okay. There's also objective. I'm just about out of time here. Well, we'll restore your full rebuttal time. Why don't you go ahead and make the point you were. Okay. I appreciate that, Your Honor. The court overlooked substantial evidence as to objective evidence that was in the record that people of ordinary skill in the art were able to identify heat-induced deformation VU Tech's own print quality expert, Mr. Fagan, at 8-4701, indicated that when a print hits a carriage, it's a head strike and it's unacceptable image quality. Mr. Whittle said the same thing, as did VU Tech's chief application manager, Mr. Currier, said that deformation, when deformation happens, you end up with a head strike and there's no acceptable quality. It's not subjective, it's objective. And if you get into the print quality issues that even Judge Perry got confused about and looked at, people of ordinary skill in the art use objective standards to look at print quality. They use benchmarks more typically than anything else. What VU Tech does, and they testified, Mr. Currier testified too, they have a print that they put on the wall. When their printers are ready to ship, they check the quality to make sure that they're acceptable quality. They print off a print, they compare the two next to one another. It's a benchmark test. It's not subjective, it's merely objective. It's the same thing with respect to what people do in the field, and this was testified to by Mr. Whittle, one of their technical experts, VU Tech's technical experts, where he said that standard test prints are used by operators in the field that are approved by engineering, marketing, and the like, to make sure that the prints that come out are acceptable quality. But I take it that there's not one single standard. I mean, to give you an example, a rather pedestrian example from the past, I remember a time when printers would produce quality of print out of a word processing system that was not good enough to file in court, was good enough to use for a draft, and we would regard that as acceptable for one purpose but not for another. I assume in the much more sophisticated world that we now inhabit that there are differences in print quality in which you would say that print is good enough to sell in a street market but it's not good enough to sell to people to hang in their homes and so forth, which is, I think, where Judge Perry was going with the notion that there isn't a single standard of acceptability. Absolutely. If you're a print house, if you're a photo house, depending upon that customer who walks in your door, they're going to show you what they want, what they need, and if you're able to produce that acceptable quality with this printer without having a head strike, using cold UV, and without having to back it off, it meets the criteria of what Judge Perry came up with. But the problem is then that that becomes, if not purely subjective, at least subject to a wide range of possible interpretation depending on the demands of the situation, right? Each situation may be slightly different, but that printer is going to know whether he's going to be able to sell that product or not, and that customer is going to know whether or not they can purchase that product. And under this court, Judge Bryson and Judge Prost, you both ruled on this in datamized, as long as there's some reasonable interpretation of the claim term deformed, it shouldn't be held invalid. There's not clear and convincing evidence here of invalidity. The claim term deformed, we shouldn't rely on just the two words print quality either. That doesn't even appear in the claim. The term is deformed, and deformed is very accurately identified in the 518 bet. It's what they're talking about, that you have a degradation of print quality because the distortion of the substrate rises so high that it either strikes the printhead... That's really where you go back to that objective test. If that's the test, then I suppose, depending on where the printhead goes, you have a hard and fast test. But if it's less than that, then it does get into an area of subjectivity because then the extent of distortion really becomes, or the print quality becomes a function of the extent of distortion, I suppose. Well, there I disagree. The heat-induced deformation, if you have a head striker, you back it off, then yes, you're getting into that assessment, but it's subjective. You say that even if you have distortion, as long as you keep the head low enough that it doesn't matter how much distortion, short of hitting the head, you're still going to have exactly the same print quality. That's correct. That's correct. It's in the record that you're going to have acceptable print quality. That's right, Your Honor. Acceptable print quality, but not maybe the finest print quality. What I'm really asking is, is there a difference, a discernible difference in the print quality with distortion that is less than the amount necessary to strike the head? Not to the naked eye, No, Your Honor. Okay. All right. Well, we will reserve your story, your rebuttal time. Let's hear first from Mr. Hill. Mr. Hill, we're awarding a little extra time to Mr. Rudman, so you can take a little extra time if you need it. May it please the Court, this Court should affirm the District Court's summary judgment of invalidity. The 823 patent, which is Vutec's prior art patent, does teach all the limitations of the independent claims of the 518 patent asserted by Leggett and Platt. In fact, the District Court found there was no genuine issue of material fact whether that was true or not. And going back to Judge Post, your question about what does the figure 7 disclose in the accompanying text in columns 5 and 6, I deposed Mr. Spencer and Mr. Shefty in this case, and Mr. Shefty's testimony wasn't how long is the line At the record 82189, I asked him, does D3 represent a cure of about 75 to 80 percent, and his answer was yes. So he wasn't talking about the line length. I want to put that on the record right now. L&P's characterization of the 823 patent is... Well, the problem, just referring to what you said, what is, you only gave us one page, so it's curious because at the end the question you say, correct, represents a cure of about 75 to 80 percent, yeah, question cured, and you don't think that's substantially cured, and the answer is no. Correct. We don't know what he said after that. He testified before this line of question directly above that. I asked him whether that 80 percent was cured to a great extent, and he said no, which Judge Perry found to be just not correct, that 80 percent in her definition, which is the definition that Lagan and Platt fought for for substantial cure, was cured to a great extent, that the 823 patent clearly taught that there was curing to a great extent, and that there was at least an 80 percent cure. But Judge Perry went beyond that. Judge Perry also looked at columns 5 and 6 in the record at A1243 and recognized that the set energy that's been talked about was the set energy when this carriage is moving back and forth at 5 feet per second, 60 inches per second, and that at that speed there's going to be a 40 millijoule cure delivered to the ink at that speed. But the patent teaches at a six times slower speed there's going to be 240 millijoules delivered to the ink on each pass. And Dr. Whittle's unrebutted testimony relied on by the district court was that's the same cure energy taught in the 518 patent. And as far as the statement that Mr. Cotas taught complete curing at the printhead and quickly doing so, well that just doesn't square with the 518 patent. Now, Annette, you're saying that it's equivalent because the 800 millijoules per square centimeter is the input energy and not the output energy, right? Actually, it's the energy that will be delivered to the ink. 800 millijoules in one dose will completely cure the ink. That's taught in the 827. Oh, that's delivered to the ink. That's not delivered to the LED. Well, I guess in joules it would be the energy, the work, coming out of the LED. That's correct. But the patent recognizes that with multiple passes you don't get a linear addition of the doses. So even at that slow belt speed at 10 inches per second and you're delivering 240 millijoules on each pass, that isn't the same as having 1,200 millijoules totally delivered to the ink. Oh, that's 240 millijoules per pass? Per pass, correct. And that's in the patent at column 5, lines 10 through 15, recognizing that at 10 inches per second each pass is 240 millijoules. And it's not some possibility or inherent possibility or something that no one would ever do. The patent teaches there will be five passes in the overlap regions, and in each of these passes 240 millijoules will be delivered. Now, the patent recognizes that isn't a complete cure because of the nonlinear cumulative impact. But that's not the issue here. The issue here isn't whether the 823 patent teaches a complete cure at the printhead. The issue is whether there's a cure to the great extent. And it does that. LNP's experts admitted that. Dr. Whittle testified to that. And the district court relied upon that, that there was a substantial cure in that it was cured to a great extent, illustrated in the patent. Now, LNP has argued there's a teaching away here, that the 823 patent somehow only focuses on setting, not curing. That doesn't matter. Under this court's decision in the Solaritas v. Rockwell case, once an element is disclosed in a prior art reference, it doesn't make it any less anticipatory, even if it's later disparaged. And we have a clear disclosure here, at columns five and six, a quantitative disclosure of the amount of energy that's being delivered that will substantially cure the ink. Then we have, even as Judge Prost pointed out, in column six we have a recognition that the LEDs themselves can be used to cure and or set the ink. To say that the curing station on figure 12 is not LEDs flies in the face of that disclosure. That's exactly what the patent is talking about. Explain that to me, because there is a reference to LEDs in column six, like in the middle of the column, lines 32. They talk about other features of LEDs, but it seems to me that when you get into the rest, the remainder of column six, you're moving on to something else, to the curing station, and there's no further reference to the LEDs. The reference is to the radiation sources, and the radiation sources identified in this patent are the LEDs or xenon flash tubes. Well, it talks about, I mean, when they're talking about the figure, right, they're talking about, well, they're talking about, well, actually the other environment in figure 12 talks about a curing station. So how are we supposed to know what the reference is here? The reference that you're referring to, I believe, Your Honor, is line 55 in column six. When it talks about figure 12, you can have the LEDs on the sides of the carriage, the radiation sources. You can also have a curing station, which is depicted as being larger than the sources on the side, and the only radiation sources identified for doing that curing are the LEDs or the xenon flash tubes that are disclosed in the patent. So I'm not arguing that we're relying on station 300 for the complete cure. That's not the issue. It's whether or not those multiple passes of the LEDs that are on the sides of the carriage create a cure to a great extent, and that is the issue that Judge Perry found there was no genuine dispute. So if we're distinguishing the curing station from the LEDs, then at least in this figure it suggests that it is subsequently cured with a curing station. Yes, that's correct. But there is a substantial cure due to the cumulative effect of five passes at the lower print speed of 240 millijoules. That is the same cure energy that was disclosed in L&P's patent. Now to say that five passes of the same energy doesn't substantially cure just doesn't make any mathematical sense. Moreover, the 518 patent recognizes that in the very first line of the patent even, in the abstract it says that applicant solution is to deliver enough energy to partially cure and then you can add heat and cure further downstream. That's exactly what they also told the Patent and Trademark Office. They said that the claims of the present invention were limited to applying a low dose of UV energy so that you could freeze the dots of ink in place and then you could have substantial curing later. That's in the record at A374, which states applicant solution is to apply a low dose of UV energy at the printhead which is enough to at least partially cure the ink so as to prevent motion of the dots. We have undisputed evidence that the 823 patent teaches a cure to a great extent at the printhead. That is the only element that L&P disputes is not present in the 823 patent. The district court found there was no genuine issue of fact whether that was there or not and found that it was. Was there another allegation at the threshold of this case? Did you also allege obviousness on the 823? We did, your honor. In fact, there are a couple of dependent claims. Aside from the dependent claims, on the independent claims. We did allege that.  So that's still in the case. If this does not survive on anticipation, that would have to be resolved. That's correct. L&P has also made the argument that the LEDs in the 823 patent or the LEDs at the time of the invention weren't strong enough. But their only evidence on that point was Mr. Spencer's report where he looked at an LED. I don't even know if it was an LED. He calls it in his report an optical semiconductor device that had a certain output wattage for one of the devices. And then he equates that with LEDs being unable to cure. Well, the wavelength that he pointed to for that device was 290 nanometers. And I know these are very minutiae measurements, but it's very important. The wavelength that's required to cure this type of ink, which is identified in the 823 patent, isn't close to that as far as the spectrum of UV goes. It's at 365 nanometers. And that is the wavelength that's required to cure. And there is no evidence in the record that LEDs at that wavelength were not sufficient to be able to make a cure to a great extent through multiple passes. Right, but you couldn't do it as quickly, presumably. You couldn't do it as quickly. It gets back to my question, which may not be necessary to resolving this case, but it's necessary for me to understand how all the pieces fit together here. It looks to me like, and you tell me if I'm barking up the wrong tree here, but it looks to me like what happened is the 823 uses this two-part system because it couldn't effect quickly, efficiently, and for all purposes, a cure, bang, right out of the box. So it has a two-stage process. They, perhaps because the LEDs got better in the meantime, have a way to get substantial curing early in the process. Is that what's really going on? Is that the difference between the two technologies? We think that that is one of the differences in the technologies, but we believe that... I'm sorry, but it's not on appeal, but we have an embodiment of this printer that was manufactured before their invention date that used the xenon flash lamps instead of the LEDs that did have complete curing. Okay, but the xenon flash lamps are not... that's not a cold UV source. That's a disputed issue of fact. The district court said she would agree they were cold UV if she were the finder of fact. I see. Oh, that's right, that's right. Okay, but in any event, they aren't as... I mean, the nice thing about LEDs is you get a pure one... monochromatic, or in the case of UV, monospectral signal. Correct. And that's why you don't get the heating or the thermal deformation. Right, yeah, yeah. All right, so what you're looking for, if you want 260, you're going to get 260 and you're not going to get bleeding over into other areas. Correct. All right. Very narrow. All right. Can I ask you a housekeeping question if we're done with this? Please. Which is that you raised in your brief certain claim construction issues, and it's hard for me, at least, so you can tell me if I'm wrong, to see why under any circumstances we would reach at least, for instance, a substantially cure claim construction question since at least in context of anticipation, your position is that you win under either. That's correct. And the reason that we appealed that, of course, it was our only chance to do so, and if you were to reverse the district court on anticipation, we would hope you would address those claim construction issues for future proceedings below. Well, only if that would change the result on anticipation, right? I mean, otherwise it's not really before... the claim construction issues aren't truly before us. I agree. With regard to this idea that deformation has to be such that you have a head strike, that's not at all what the patent teaches. The 518 patent teaches that deformation that supposedly impacts print quality or degrades print quality is any thermal deformation whatsoever, including slight warping or slight raising of the substrate. Well, I mean, you clearly must mean more than an indiscernible amount. Correct. So discernible by whom, what standard is the problem? That's right. And that's obviously our counter proposal on claim construction was that it had to be measurable by a person of skill in the art. And the 518 patent teaches how to measure that deformation. We've had argument about all surfaces are deformed or have inherent deformations. Well, the 518 uses lasers and optical sensors to adjust the head height to maintain that exact one to two millimeter head height, regardless of whether the surface is contoured or not. In fact, it teaches printing on contoured surfaces. And so it's no thermal deformation at all of any of the surface, whether it's contoured or not. That's what the 518 was teaching. So I maintain that the clear and convincing evidence and what district court found that there was no genuine issue of fact is that the 823 patent fully anticipates L&P's patent claims. As far as the dependent claims go, L&P doesn't even argue on appeal that those claims are not taught by Butek's other prior art patent, the 355. And as the district court found, there was ample motivation to combine the 355 with the 823 because it's the same inventors working on the same machine. Thank you. Thank you, Mr. Hill. Mr. Rudman, I think I said we would give you your full rebuttal time, which is three minutes. Thank you very much. I'll address a few, unless you have some further questions for your honors. Well, you're probably going to address this, but I'd like you to help us with the math on the millijoules per square centimeter. Yes, the 240 millijoules that counsel referred to. That portion of the 518 patent is still talking about setting ink and that you can have 50 watts per an inch that will set. You're talking about the 823 patent. I'm sorry, yes, the 823 patent in column five. Sorry if I threw you off. In column five, it's talking about what you would need in order to set ink at different speeds. It doesn't do anything with respect to substantially cure. The interesting thing is that Mr. Willis But if they've disclosed a way to achieve the same energy level that you employ to substantially cure, they've disclosed substantial cure. They haven't done that, your honor. Okay, now tell me why they haven't done that. What they've done is they've disclosed using LEDs that have 40 millijoules per centimeter squared. If you go at the slowest possible rate, it provides in column five that you'll end up with 240. It doesn't tell you how to get to 800 millijoules. It doesn't teach to go that way. But it doesn't teach to go that way. Its only goal is to set, not to cure. But it does disclose multiple passes and it does disclose slow speed. So if you put those two together, you get over the 800. I don't know that. That's a question of fact. I can't tell you that you would end up with 800 or not. The patent doesn't tell you that. There's not clear and convincing evidence in this patent that you'll get to 800 millijoules. The question with respect to 50 watts was directly contradicted by Mr. Spencer, and it was Mr. Whittle's calculations, it was extrinsic calculations telling you what this would do to contradict the intrinsic evidence in the 823 patent that it's only to set and not to cure. I don't know that if you take 240 millijoules at the slowest speed using an LED, what will happen, and it doesn't tell you that because this teaches a completely different direction. It's telling you that you're trying to set, not to cure. This patent, figure 7B, the inherency argument... You say it's a completely different direction, but that strikes me as... I'm having a hard time with that concept because they're both heading in the same direction. One of them is heading there faster than the other. One of them is heading there with an LED system that cures more rapidly, and the other one doesn't have that system, doesn't cure as rapidly, but they're both heading in the same direction. I don't see how that's a different path. What's interesting, Judge, is practically they did head in different directions. Even though Butech had this 823 patent, they had filed for it back in May, I think, of 2001, or maybe it was April. They came out with a printer with the xenon lamps, which are broad spectrum. It's a question of fact that we disagree on as to whether it's cold UV or not. How far does their spectrum extend, the xenon lamps? It's a full spectrum. Full spectrum? It's full spectrum. And where's the center of their flux? If you looked at the chart, it goes up and down. It's not a bell curve flux?  And it ranges from IR to UV? It ranges from UV through the visible all the way up to IR. And what they had in the industry was they had heat-induced deformation problems. And when L&P entered the market with its cold UV printer, Butech went out, and this is in the record, and retrofitted every single printer that they had with cold UV lamps. If the 823 patent had taught them how to fix that problem, they didn't even know how to do it. There's not clear and convincing evidence in the record that this, that teaches setting and then later curing, what people always did in the industry was cure later on downstream. What about the, what appears, what is arguably uncontroverted evidence that this was substantially cured, the D3, 75% to 80%? It's controverted, Your Honor. Where? It was controverted by Mr. Spencer in his rebuttal report, that it was not substantial curing. When they asked Mr. Shefty, the only thing they're relying upon is Mr. Shefty's statement that it went 80, and I don't have the full deposition before me, but he specifically said before that, that is on that one page that's in the record, that it's not substantially cured. And then they said, well, it goes 75 to 80% down, you don't think that's substantially cured. You can't pull that, we discussed it already, the quantitative value of that line. It's disputed. Mr. Hill says, well, that's not quite what he was asked and not quite what he said. He didn't say, well, the line looks like it's 75% down to the bottom. He said, this depicts 75% in the context of the patent. And he's not somebody of ordinary skill. He's a patent lawyer who was simply there testifying on issues unrelated to the technology itself. I think I'll finish up by indicating that the term deform only needs to be as definite as the subject matter permits, as was set forth in datamize, and that the term deform, as properly construed by the court, is understandable by people of ordinary skill in their art. They can determine whether or not there's been heat-induced deformation such that there's unacceptable print quality. And if for some reason this court concludes that that definition is inappropriate, it's not a basis to invalidate the patent. Rather, it should either be remanded back to the district court for proper construction and not invalidate the patent. Let me see if I understand the procedural question with respect to the indefiniteness vis-a-vis the anticipation-slash-obviousness issues. Judge Perry, I think, invalidated the asserted claims with respect to anticipation-slash-obviousness. That's correct. And she said, I may not have her words right, but I was a little confused about the way the indefiniteness rulings overlapped or perhaps extended beyond the scope of the invalidity on the asserted claims. Was she saying that indefiniteness applies to every claim in the patent or only with respect to the asserted claims? My understanding is that she was only looking at the asserted claims. So that the indefiniteness is, for lack of a better term, a backup basis for invalidity with respect to the asserted claims but not something that goes beyond the scope of the invalidity on anticipation-slash-obviousness. That's accurate. And if I could just ask, Mr. Hill, is that your understanding as well, Mr. Hill? No, Your Honor. I believe that it extended to all of the claims because all of the independent claims of the patent, even the one that they dropped later on in the case, had the deformed limitation. Okay, well, we'll have to resolve that. Go ahead, please. Claim 20 does not have the word. I don't believe it has the word deformed. I have to double-check it. Okay, well, we can check that. But this is helpful to give us a direction to look. Okay, thank you. Very well, the case is submitted. We thank both counsel. Thank you.